**PEDIATRIC MEDICAL DEVICES, INC., Plaintiff,**

v.

**INDIANA MILLS & MANUFAC-TURING, INC., Defendant.**

**Civil Action No. 1:11–cv–2613–TCB.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 16, 2013.

Ann Grunewald Fort, William L. Warren, Sutherland Asbill & Brennan, Atlanta, GA, for Plaintiff.

Ann G. Schoen, Barry M. Visconte, Frost Brown Todd, Cincinnati, OH, Sumner Curtis Rosenberg, Ballard Spahr, Atlanta, GA, for Defendant.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This matter is before the Court on the May 24, 2013 motion [49] of Plaintiff Pediatric Medical Devices, Inc. (PMD) for partial reconsideration of the Court's April 26, 2013 claim-construction order [47], 2013 WL 2395994, which construed ten disputed claim terms of the patent-in-suit, U.S. Patent No. 7,281,285 ("the '285 patent"). PMD challenges the Court's construction of the term "said pediatric emergency transport device being operatively adapted for attachment to and detachment from a conventional stretcher" to mean "said pediatric emergency transport device designed and configured to attach to and detach from a conventional stretcher without the use of straps or belts." PMD argues that reconsideration is warranted because it did not have notice of the construction and that the construction is a clear error and would result in manifest injustice. According to PMD, the Court should delete the limitation that the device attach to and detach from the stretcher "without the use of straps or belts," or alternatively, modify the construction to clarify that "straps or belts" refers to only stretcher straps and not straps or belts that are affixed to the device.

## I. Background

On August 8, 2011, PMD filed this patent-infringement action, claiming that the "SafeGuard Transport" device manufactured by Defendant Indiana Mills & Manufacturing, Inc. ("IMMI") infringes the '285 patent, which PMD owns and which is directed to a device for the emergency

transport of pediatric patients that attaches to a conventional stretcher.

On April 4, 2012, pursuant to this Court's Local Patent Rules, the parties filed a joint claim-construction statement, identifying ten disputed terms.

On February 13, 2013, the Court held a *Markman* hearing at which the parties provided argument and evidence in support of their positions. At the hearing, the Court announced its constructions for eight of the ten disputed terms.

On April 26, the Court issued its claim-construction order, setting forth its reasoning for the constructions announced at the hearing as well as its analysis and construction of the two remaining disputed terms.

One of those remaining terms was the term at issue in the present motion: "said pediatric emergency transport device being operatively adapted for attachment to and detachment from a conventional stretcher." In the April 26 order, the Court explained that it had carefully reviewed the parties' arguments, the specification, and the prosecution history to reach its construction. Specifically, the Court found that considering the patentee's disavowals of straps and belts, the claim's requirement that the device be "operatively adapted for" attaching to and detaching from a stretcher, and the descriptions in the specification providing that the transport device engages with a stretcher as part of its design and operation, the term should be construed to mean "said pediatric emergency transport device designed and configured to attach to and detach from a conventional stretcher without the use of straps or belts."

## II. Discussion

### A. Legal Standard

■ The Federal Rules of Civil Procedure do not specifically authorize motions for reconsideration. Local Rule 7.2 provides that motions for reconsideration are not to be filed "as a matter of routine practice," but only when "absolutely necessary." LR 7.2E, NDGa. A party may move for reconsideration only when at least one of the following three elements exists: (1) the discovery of new evidence; (2) an intervening development or change in the controlling law; or (3) the need to correct a clear error or manifest injustice. *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 916 F.Supp. 1557, 1560 (N.D.Ga. 1995).

■ Because reconsideration may occur only under those limited circumstances, a motion for reconsideration "is not an opportunity for the moving party ... to instruct the court on how the court 'could have done it better' the first time." *Id.* In other words, a party "may not employ a motion for reconsideration as a vehicle to present new arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar arguments to test whether the Court will change its mind." *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1338 (N.D.Ga.2000); *see also Godby v. Electrolux Corp.*, Nos. 1:93–cv–0353–ODE, 1:93–cv–126–ODE, 1994 WL 470220, at *1 (N.D.Ga. May 25, 1994) ("A motion for reconsideration should not be used to reiterate arguments that have previously been made.... [It is an improper use of] the motion to reconsider to ask the Court to rethink what the Court has already thought through—rightly or wrongly.") (citations omitted); *In re Hollowell*, 242 B.R. 541, 542–43 (Bankr.N.D.Ga.1999) ("Motions for reconsideration should not be used to relitigate issues already decided or as a substitute for appeal. Such motions also should not be used to raise arguments

which were or could have been raised before judgment was issued.") (citation omitted).

## B. Analysis

### 1. Reconsideration Is Not Warranted

█ PMD argues that the Court should reconsider its construction for two reasons. First, it contends that it had no prehearing notice that the Court might construe the disputed term to mean "without the use of straps or belts"; PMD points out the construction adopted by the Court was not proposed by IMMI and the Court did not specifically notify the parties before the *Markman* hearing that it was considering construing the term to exclude straps and belts. According to PMD, it should be permitted to present evidence and argument in opposition to the Court's construction. Second, PMD argues that because the Court's construction is clearly erroneous in light of the arguments and evidence set forth in its motion, manifest injustice will result because its current and future infringement claims "will be weakened without a proper basis in law or fact."

It is true that neither party proffered the exact construction that the Court ultimately adopted. In the parties' joint claim-construction statement, PMD argued that the term should be construed as "said

pediatric emergency transport device releasably coupling to a conventional stretcher," and IMMI contended that the term is a means-plus-function claim pursuant to 35 U.S.C. § 112, ¶ 6, with the corresponding structure being a spring-loaded clamp mechanism that clamps to the rail of a stretcher, or alternatively, that the claim is invalid for omitting essential structure.[1] But even though the "without straps or belts" limitation was not part of IMMI's proposed construction, the Court does not agree that PMD had no notice of a potential construction that would exclude straps and belts as a method for attaching the device to a stretcher.

First, IMMI argued in its brief in response to PMD's claim-construction brief that the claim term should exclude belts. Specifically, IMMI contended that PMD's proffered construction should be rejected because the patentee had only described the spring-loaded clamps in the specification and had in fact "criticized other devices, specifically belts." IMMI therefore urged that "belts cannot be an 'equivalent.'" While IMMI did not directly argue that the term should be construed to exclude belts, it did contend that the method of attachment was limited and did not include belts.[2]

---

1. As pointed out by PMD, the Court erroneously stated in its claim-construction order that IMMI alternatively argued that this term means "a position of an upper portion of each shoulder belt is selectable from a plurality of discrete positions located on the upper frame section via coupling of the upper portion of each shoulder belt directly to the upper frame section from the front of the device." IMMI did not advance this argument in relation to this claim, but as an alternative construction to a different disputed claim term that it argued was a means-plus-function. The Court notes that this error in no way influenced its adopted construction.

2. PMD argues that " '[e]xcludes the use of belts' is merely a restatement of the means-plus-function argument, which IMMI used to limit the claim to the clamp mechanism that PMD elected out of the application." This argument is telling because as PMD points out, IMMI's argument that belts should be excluded is closely tied to its argument that the claim is a means-plus-function claim-an argument that IMMI asserted in the joint claim—construction statement. IMMI's means-plus-function argument was premised upon its contention that the means for attaching the device to a stretcher is limited. Although the Court did not agree that the claim is a means-plus-function claim or that the attachment mechanism is limited to clamps, it

Second, in its *Markman* hearing presentation materials, IMMI expressly stated that "to the extent that the phrase is not determined to be governed by § 112, ¶ 6, the claim is invalid or excludes use of belts," and at the hearing IMMI extensively argued that, at a minimum, the patentee disavowed straps and belts as a method of attachment. Third, at the hearing PMD's counsel discussed why straps and belts should not be excluded, and the Court carefully considered those arguments in its claim-construction order.

Nevertheless, PMD contends that "[t]his argument [regarding the exclusion of belts] never made its way into a proposed claim construction, even if it is found in IMMI's brief." PMD fails to explain why IMMI's advancing the argument in its brief but not expressly proposing a construction that would exclude belts did not sufficiently notify PMD of such a potential construction.[3] Further, PMD cites no authority for the proposition that the Court was required to provide PMD with pre-hearing notice if it was considering a construction not specifically advanced by the parties.[4]

More importantly, PMD fails to acknowledge that in construing the claim terms, the Court was not restricted by the parties' proffered constructions. To be sure, "the trial judge has an independent obligation to determine the meaning of claims, notwithstanding the views asserted by the adversary parties." *Exxon Chem. Patents v. Lubrizol, Corp.*, 64 F.3d 1553, 1555 (Fed.Cir.1995). "[T]he judge's task is not to decide which of the adversaries is correct," but instead "must independently assess the claims, the specification, and if necessary the prosecution history, and the relevant extrinsic evidence, and declare the meaning of the claims." *Id.; see also MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 Fed.Appx. 142, 143 (Fed.Cir. 2011) ("[T]he fact that neither party advanced the claim construction adopted by the Commission is not legal error."). The Court did exactly that—it independently

agreed with IMMI's argument that the claim should be construed so as to limit the means of attachment to and detachment from a stretcher based on the "operatively adapted for" language in the claim.

3. PMD also fails to explain why it could not have moved to file a supplemental brief regarding IMMI's contention that the patentee disavowed the use of straps and belts as a means of attachment.

Because PMD had notice, this case is distinguishable from *Insituform Technologies, Inc. v. AMerik Supplies, Inc.*, 850 F.Supp.2d 1336, 1349 (N.D.Ga.2012), where the Court considered the merits of the defendant's arguments because in determining the installation price to be used as a baseline for damages, the Court adopted a price and rationale that the plaintiff had not advanced and thus the defendant "had little incentive to argue that a different installation price should be used as a baseline prior to the Court's order."

The Court explained that the plaintiff "relied exclusively on the argument that it had an established royalty of $200 and there was

no need to calculate a hypothetical royalty." The Court rejected the plaintiff's argument and "chose a hypothetical royalty equal to 3.4% of the average lateral-liner installation price." *Id.* Here, IMMI did not rely exclusively on its means-plus-function argument; it also argued that belts should be excluded. Thus, *Insituform* is inapposite.

Moreover, in *Insituform*, the Court also considered the merits of the defendant's motion because it determined that the consequences of failing to reduce the baseline amount would be manifestly unjust. As set forth below, in this case the Court does not find that manifest injustice will result from the Court's failure to reconsider its construction.

4. At one point in its brief, PMD argues that it "plainly had no notice." This contention is unfounded in light of IMMI's presentation materials and the discussion regarding straps and belts at the *Markman* hearing.

assessed the parties' arguments and proffered constructions and thoroughly reviewed the claims, specification and prosecution history to arrive at the meaning of the claim. Thus, whether either party advanced the specific construction adopted by the Court is irrelevant.

Next, based on the Court's careful analysis, there is no clear error in the Court's claim-construction order. While PMD disagrees with the Court's application of the law and interpretation of the claim, the arguments it raises essentially amount to an attempt to relitigate an issue that has already been decided; this is not a proper basis for a motion for reconsideration. *See In re Hollowell,* 242 B.R. at 542–43 ("Motions for reconsideration should not be used to relitigate issues already decided or as a substitute for appeal."); *Preserve Endangered Areas of Cobb's History, Inc.,* 916 F.Supp. at 1560 (a motion for reconsideration "is not an opportunity for the moving party . . . to instruct the court on how the court 'could have done it better' the first time.").[5]

Finally, PMD's contention that manifest injustice will result in the absence of reconsideration is without merit. PMD contends that unless the Court amends the construction its "current and future infringement claims will be weakened." As to its current infringement claims, the Court has not ruled on IMMI's pending motion for summary judgment; thus, the impact of its construction is not yet clear.

Regarding future infringement claims, although the Court's claim construction might be persuasive in other cases, it is not necessarily binding. First, "[s]ince *Markman* [*v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ], various district courts have taken slightly different approaches to other courts' claim constructions, but despite the [Supreme] Court's suggestion, none has applied stare decisis." *Rambus Inc. v. Hynix Semiconductor Inc.,* 569 F.Supp.2d 946, 965 (N.D.Cal.2008). Additionally, while issues of preclusion/collateral estoppel and judicial estoppel might arise in future infringement actions, courts have taken different approaches in applying these doctrines.

For example, in *Sears Petroleum & Transport Corp. v. Archer Daniels Midland Co.,* No. 5:03–cv–1120, 2007 WL 2156251, at *8 (N.D.N.Y.2007), the court held that "considerable deference should be given to those prior decisions unless overruled or undermined by subsequent legal developments, including intervening case law." Similarly, in *KX Industries, L.P. v. PUR Water Purification Products, Inc.,* 108 F.Supp.2d 380, 387 (D.Del.2000), the court held that it would adhere to its prior claim construction, but only "to the extent the parties [did] not raise new arguments." In contrast, courts in the Northern District of California "have been willing to consider a prior claim construction, but have stressed the importance of conducting an independent inquiry." *Rambus Inc.,* 569 F.Supp.2d at 965–66 (citations omitted). Thus, the effect of the Court's construction in future actions is unclear.[6]

In sum, PMD has not sufficiently shown that reconsideration is required; it has not identified any newly discovered evidence or an intervening development or change

---

5. Further, as set forth in detail below, even after considering the merits of PMD's arguments, the Court finds that it correctly construed the claim term.

6. Additionally, PMD does not argue that it will not be able to appeal the claim construction. Obviously, if the Federal Circuit sees fit to overrule the Court's construction, PMD will not be forever saddled with an erroneous construction, as it claims.

in the controlling law, and it fails to show that reconsideration is necessary to correct a clear error or manifest injustice. Accordingly, reconsideration is not warranted.

## 2. The Court's Construction Is Correct

■ Even though PMD has not identified a sufficient basis for reconsideration, the Court has considered the merits of PMD's motion.[7] Despite PMD's arguments, the specification and prosecution history support the conclusion that the patentee disavowed both straps and belts as a means for attaching the pediatric emergency transport device, and that disavowal is not limited to straps that start at the stretcher.

PMD first argues that "although the Court's construction appears to treat 'straps' and 'belts' as synonyms, in fact the patentees used the two terms to identify different things." But the specification indicates otherwise. It provides:

In response to the failures of the above-mentioned techniques for transporting injured children, alternative types of pediatric restraining devices have been developed. For example, one device secures *to a stretcher using straps*. It includes a bendable support mattress secured in a given angular position by leg supports. Medical personnel secure the injured child to the support mattress after this device is attached to the stretcher. While this device provides some improvement, it impairs administration of CPR. In addition, *connecting the device to the stretcher using belts* demands that personnel spend additional time securing the device.

'285 patent col. 2, ll. 34–45 (emphasis added). In criticizing the same prior-art device, the specification refers to the device as attaching to the stretcher "using straps" in one sentence, but then refers to the device as connecting to the stretcher "using belts" in a different sentence. Thus, contrary to PMD's contention, the specification does not refer to belts solely in reference to the method for restraining the child, but instead uses the terms straps and belts interchangeably to refer to a mechanism for attaching the device to a stretcher.

■ Moreover, a review of the specification in conjunction with the prosecution history supports construing belts and straps as synonyms. In distinguishing a different prior-art device, the specification provides:

Another pediatric device provides a hard frame with rotating side panels. It attaches to a stretcher with straps and stores in a collapsed position. Though the collapsibility feature enables easy storage, this pediatric device is difficult to attach to a stretcher. Medical personnel sacrifice time in securing the device to the stretcher. In addition, using straps create [sic] the potential that the device may move during transport. This potential movement can hinder performance of lifesaving procedures.

'285 patent col. 2, ll. 46–54. This passage criticizes the use of straps as a method for attaching the device to the stretcher. However, in the prosecution history, the patentee initially claimed the method of attachment as being "a clamp assembly attached to a frame and operatively adapted to engage with and releasably lock onto opposed rails of a conventional stretcher without the use of belts." *See, e.g.,*

---

**7.** The Court has done so out of an abundance of caution and to perfect the record for appeal.

Amend. & Resp. at 16 (Jan. 11, 2007). It is only logical that the claim's initial exclusion of belts related to the specification's criticisms of straps and belts.[8]

PMD next argues that the Court wrongly believed that it was "required to impose some kind of limit on the claim that is not found in the language approved by the patent examiner." The reason the Court was required to impose a limitation upon the claim is because the language approved by the examiner includes the term "operatively adapted for," which is limiting. Nonetheless, PMD argues that a "broad meaning is perfectly permissible under claim construction rules." But a broad meaning is not permissible if it reads out limitations included in the claim language. PMD acknowledges that "[u]nder its proposed construction, virtually any means for attaching a similarly designed [device] to the stretcher would be infringing, as long as the PETK could also be detached from the stretcher after it was attached." But as explained in the April 26 order, such a construction fails to account for the phrase "operatively adapted for." Because meaning must be given to all the terms of a claim, PMD's proffered construction allowing for attachment and detachment by "virtually any means" must be rejected. *See Merck & Co. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1372 (Fed.Cir.2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG,* 378 F.3d 1396, 1410 (Fed.Cir. 2004) (a claim construction that renders claim terms superfluous is generally disfavored).

In order to give meaning to the term "operatively adapted for," the Court looked to both the specification and the prosecution history. As set forth above, the specification repeatedly disparages the use of straps and belts as a means for attaching the device to a stretcher. In the description of the related art, the specification states that one prior-art device's method of "connecting the device to the stretcher using belts demands that personnel spend additional time securing the device," '285 patent col. 2, ll. 43–45, and that another device that connects via straps is "difficult to attach to a stretcher," resulting in "[m]edical personnel sacrific[ing] time in securing the device to the stretcher" and "creat[ing] the potential that the device may move during transport," which "can hinder performance of lifesaving procedures," '285 patent col. 2, ll. 49–54. The specification's discussion of prior art therefore emphasizes that using straps or belts as a means to attach the device to a stretcher is not preferred because it takes too much time and threatens the patient's safety.

Additionally, other parts of the specification provide context for the term "operatively adapted for." First, the specification's summary of the invention stresses that the speed of attachment to and detachment from a conventional stretcher is a crucial feature of the device. It provides that using a single-action clamp mechanism "reduces the time needed to secure the device to a stretcher, allowing medical personnel to focus more on the injured child," '285 patent col. 4, ll. 20–25. Second, the technical field states that the "invention relates in general to the field of emergency transport devices and, more particularly, to a device for emergency transport of pediatric patients adapted to engage rails of a conventional stretcher,

---

**8.** The Court is cognizant of the fact that this language was not included in the final claim. Nevertheless, the language used by the patentee during the patent's prosecution is helpful in providing context for the specification.

and accessories therefor." '285 patent col. 1, ll. 20–25. The fact that the invention must be "adapted to engage the rails of a conventional stretcher" implies that the method of attachment is limited. PMD fails to explain how belts and straps are adapted for engaging the rails of a conventional stretcher, and considering the specification's criticism of straps and belts as an inefficient and unsafe method of attachment, it seems that straps and belts are excluded as a method for attaching the device to the stretcher.

Thus, the specification indicates that for the device to be "operatively adapted for attachment to and detachment from a conventional stretcher," the means of attachment should not be straps or belts; the Court therefore correctly concluded that the claim should be construed to exclude belts and straps as means of attachment. This is because, as explained in the April 26 order, "the claims should not be read so broadly so as to encompass the distinguished prior art structure." [47] at 46 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed.Cir.2001)).

PMD argues, however, that the Court wrongly relied on *SciMed*. It contends that there the Federal Circuit found a clear disclaimer of the use of a dual lumens structure because the specification not only criticized the use of such a structure, but also expressly limited all embodiments of the claimed invention to a coaxial structure. According to PMD, because the embodiments here do not limit the method of attachment to the stretcher, *SciMed* is inapposite.

While it is true that the Federal Circuit found the patent's limitation on the embodiments to be the "most compelling portion of the specification," it also relied on the language from the abstract and the patent's discussion of certain prior-art structures to hold that the patentee had disclaimed the use of a dual-lens structure. *Id.* at 1342. Here, although the patent does not expressly limit all embodiments of the claimed invention to any one particular method of attachment, "[r]ead together," multiple parts of the patent lead to the conclusion that straps and belts were disavowed as a method for attaching the device to a stretcher. *Id.* at 1343. Accordingly, *SciMed* provides support for the Court's conclusion that the claim should not be construed to encompass a prior-art structure that the patentee repeatedly disparaged, i.e., the use of straps or belts.

The prosecution history further supports the Court's construction. This is because throughout the patent's prosecution, the patentee relied on the device's lack of belts [9] as a means for attaching it to a stretcher and the device's ability to rapidly attach to a stretcher to distinguish it from prior art. First, in its January 16, 2007 amendment and response, PMD repeatedly distinguished prior art, arguing that prior art did not disclose "(1) a pediatric emergency transport device comprising a clamp assembly attached to a frame and operatively adapted to engage with and releasably lock onto opposed rails of a conventional stretcher without the use of belts; and (2) a pediatric emergency transport device operatively adapted for rapid mounting to and demounting from a conventional stretcher." Amend. & Resp. at

---

**9.** The April 26 order provides that the "patentee specifically relied on the lack of straps as the means for attaching the [device] to a stretcher." As set forth below, the prosecution history references belts when discussing the method for attaching the device to the stretcher, and the Court therefore should have used the term belts in its discussion of the prosecution history. However, because the specification uses the terms belts and straps interchangeably, the Court's use of straps rather than belts does not change its analysis.

13 & 21 (Jan. 16, 2007) (distinguishing Travisano patent); *id.* at 14 (distinguishing Smeed patent); *id.* at 16 (distinguishing Smeed in combination with Gaddis, Rankin and Perdelwitz patents); *id.* at 18 (distinguishing Cheng patent).

The patentee continued to rely on these distinguishing features in her March 28, 2007 amendment and response. *See* Amend. & Resp. at 10 (Mar. 28, 2007) (distinguishing Travisano patent); *id.* at 11 (distinguishing Smeed patent); *id.* at 13 (distinguishing Smeed in combination with Gaddis, Rankin and Perdelwitz patents); *id.* at 15 (distinguishing Cheng patent); *id.* at 16 ("The combination of the teaching of Cheng with the teachings of Gaddis, Rankin and Perdelwitz would still fail to teach or suggest a clamp assembly attached to a frame and operatively adapted to engage with and releasably lock onto opposed rails of a conventional stretcher without the use of belts"); *id.* at 18 (distinguishing combination of Travisano, Gaddis, Rankin and Perdelwitz).

While these distinctions were made in relation to claims that were ultimately cancelled, they are important for providing context for the phrase "operatively adapted for." *See Seachange Int'l, Inc. v. C–COR, Inc.,* 413 F.3d 1361, 1372 (Fed.Cir. 2005) ("In [construing a claim], [courts] examine the entire prosecution history, which includes amendments to claims and all arguments to overcome and distinguish references[,]" and "[w]here an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language.") (citations omitted). Here, the prosecution history makes clear that the patentee re-

peatedly emphasized that the device was operatively adapted to "rapidly" attach to and detach from a conventional stretcher "without the use of belts." [10]

Further, the patentee continued to stress the importance of the speed of attachment in the claim that was allowed. In the March 28, 2007 amendment and response, the patentee distinguished the "newly presented claims" 33–35 from all prior art previously considered by the examiner in both the '285 patent and the parent patent, the Williams patent, because among other things the device claimed in the '285 patent is "operatively adapted for rapid attachment to and detachment from a conventional stretcher." *Id.* at 7. Although the allowed claim did not include the word "rapid," the patentee's repeated emphasis on the speed of attachment in comparison to prior art must be considered. Thus, viewing the prosecution history in combination with the specification's disparagement of belts and straps as slow and unsafe methods for attaching a device to the stretcher, the claim excludes those methods.

PMD argues, however, that even if straps and belts are excluded, the exclusion applies only to stretcher straps. It contends that when the specification disparages straps as a method for attachment in prior-art devices, it is "presumed" that straps mean stretcher straps.

The problem with PMD's argument is that there is nothing in the specification to indicate that it is referencing stretcher straps; it merely uses the terms "straps" and "belts." Further, there is no reason for a person of ordinary skill in the art to infer that the specification is referring to only stretcher straps. PMD argues that

---

10. *Significantly, the cited amendments and responses both occurred after the restriction requirement in which the patentee elected to* pursue the device over the universal clamp that was originally part of the claim.

the prior-art device discussed in column 2, lines 46–48 of the specification is actually the Ferno Pedi–Pal, a prior-art device that attaches to a stretcher with the stretcher's straps.[11] However, the specification never identifies the device it is referencing; it simply refers to the prior art as "[a]nother pediatric device [that] provides a hard frame with rotating side panels." Without the specification specifying the Pedi–Pal by name or providing the relevant patent for the Pedi–Pal, it is unclear how a person of ordinary skill in the art could possibly understand that the prior art being referenced was indeed that device. What's more, the Pedi–Pal is nowhere in the patents prosecution history, making it even more unlikely that a person of ordinary skill in the art would understand the specification's discussion of prior art as being a criticism of that particular device.

The patent's failure to specifically identify the prior art makes it distinguishable from the patents in *Coca–Cola Co. v. Pepsico, Inc.*, 1:02–cv–2887–RWS, 2004 WL 4910334 (N.D.Ga. Sept. 29, 2004), which PMD cites in support of its contention that only stretcher straps should be excluded. In *Coca–Cola*, the defendants argued that because the specification criticized the prior art's use of dip tubes, the criticism was "equivocal: stay away from dip tubes!" and the patent disavowed the use of dip tubes. *Id.* at *10. The Court disagreed. It explained that because the criticism followed a "recitation of certain prior references employing 'conventional dip tubes,'" it "seemed to be directed at disadvantages associated with dip tubes as employed by the cited references." *Id.* Significantly, the specification expressly identified the "certain prior art references" by the patent numbers. Thus, a person of ordinary

skill in the art would understand that the criticism of dip tubes was "directed not at inherent flaws of tubes as liquid passage means, generally, but rather on how the prior art incorporated such tubes in the container to prepare it for syrup dispensation." *Id.*

PMD argues that as in *Coca–Cola*, not all straps are disavowed—only those used in the prior art, i.e., stretcher straps. But PMD's reliance on *Coca–Cola* is misplaced. Here, in contrast to the patent in *Coca–Cola*, the specification does not identify the prior art being criticized, so it is not clear that its discussion of straps refers to only stretcher straps. Instead, it seems that the disparagement applies to straps generally. After all, "such a distinction is not relevant to the many disadvantages the patentee attributes to straps" and belts. [47] at 46. Regardless of whether the straps start at the stretcher or the device, they are cumbersome, time-consuming and unsafe according to the specification. None of the evidence adduced by PMD convinces the Court otherwise.

Accordingly, the Court correctly construed the term to exclude straps and belts generally.

## III. Conclusion

For these reasons, PMD's motion for reconsideration [49] of the Court's April 26 order [47] is DENIED.

---

11. In the April 26 order, the Court noted that the "patentee disparages both straps that start at the stretcher, '285 patent col. 1, ll. 57–57, and straps that start at the device, '285 patent col. 2, ll. 46–51." The Court presumed that the device included straps that start at the stretcher. However, the specification does not specify where the straps originate.